UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

    - v. -                                    :          18 Cr. 218 (RMB)

CHRISTIAN TORO,                       :

               Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

                                                GEOFFREY S. BERMAN
                                                United States Attorney
                                                Southern District of New York

Elizabeth A. Hanft
Assistant United States Attorney

The Government respectfully submits this memorandum in connection with the sentencing of defendant Christian Toro ("Toro" or "the defendant"), which is scheduled for May 22, 2019, at 10:00 a.m. The Final Presentence Investigation Report ("PSR") prepared by the United States Probation Department ("Probation Department"), dated February 15, 2019, has correctly calculated the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") total adjusted offense level of 21, with a Guidelines range of 37 to 46 months' imprisonment. (PSR at ¶ 82, p. 21). The Probation Department recommends a custodial sentence of 42 months' imprisonment. (PSR at pp. 21-23).

For the reasons set forth below, including the nature and circumstances of the offense; the history and characteristics of the defendant; the need in this case to promote respect for the law and deterrence; and to ensure just punishment, the Government respectfully submits that a variance above the applicable Guidelines, pursuant to 18 U.S.C. § 3553(a), is appropriate in this case. In light of the egregiousness of the defendant's conduct and its surrounding circumstances—which included repeatedly enlisting minors to handle dangerous explosive materials—such a sentence would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

### I.   Offense Conduct

Toro and his co-defendant, Tyler Toro (who is also the defendant's brother), stockpiled explosives and other materials that, together, constituted a bomb—a "readily assemblable destructive device" —in an apartment building in the Bronx. (PSR ¶¶ 27-29). They stored a cache of dangerous materials in that apartment, and Toro enlisted minors—students at the school

where he worked—to assist him in building the device. (PSR ¶ 27). In addition, Toro was engaged in a sexual relationship with one of those students ("Student-1"). (PSR ¶ 23).

On December 4, 2017, Student-1, who attended the school in Harlem where Toro worked as a teacher, called a bomb threat in to the school. (PSR ¶ 22). Law enforcement arrested Student-1 as a result of the bomb threat. (*Id.*). Upon reviewing her text messages, law enforcement agents found that the same day, Student-1 had sent Toro a text message stating that she was "bored asf." (*Id.*) Toro had responded, "You should call the school from your google # from the bathroom / Say there's a ombbay in the uildingbay." (*Id.*). After Student-1 called in the bomb threat, Toro sent a message stating that he did not think Student-1 had been serious, to which Student-1 responded that she had done what Toro told her to do. (*Id.*).

Not long after the bomb threat, Toro resigned from his teaching job. (*Id.*) When his brother returned Toro's school laptop, the laptop had on it, among other things: (i) a copy of The Anarchist Cookbook, a book that provides instructions for manufacturing explosive devices; (ii) a Federal Emergency Management Agency ("FEMA") document, entitled "GS-17 Overview, FEMA Document, Brief to Metropolitan North New Jersey Federal Executive Board"; (iii) a photograph of a chart entitled "Understanding the Semitic Attack Pattern"; and (iv) an organizational chart of positions at the Central Intelligence Agency. (PSR ¶ 25).

On February 8, 2018, law enforcement agents interviewed Toro at his Bronx apartment, where he lived with his mother and brother. (PSR ¶ 26). During that interview, Toro told agents that he had not intentionally downloaded The Anarchist Cookbook to his school computer; instead, he claimed, he had been researching the 2013 Boston Marathon bombings and had come

2

across The Anarchist Cookbook. (*Id.*). Toro stated that he had only looked at the book's table of contents. (*Id.*). He further claimed that he had never built a bomb. (*Id.*).

In fact, Toro had paid students to assist him in building a destructive device. (PSR ¶ 27). Specifically, at least two students at the school visited Toro's apartment on several occasions between approximately October 2017 and early January 2018. (*Id.*). During those visits, Toro paid each student approximately fifty dollars per hour to break apart commercial fireworks and remove and store their explosive powder in containers. (*Id.*). Toro recorded some of these payments: a page inside a notebook recovered from Toro's apartment on the day he was arrested, labeled "Operation Flash," contained a ledger with the initials of one of the students, along with the apparent hours that student had worked and payment he either made to or owed the student in exchange for the student removing explosive powder from fireworks. (PSR ¶ 33). On one of the visits, Toro lit the explosive powder—what he referred to as "flash powder"—on fire in order to demonstrate to a student how it worked. (PSR ¶ 27). Toro recommended that the student read The Anarchist Cookbook. (*Id.*).

On February 15, 2018, law enforcement agents executed a search warrant at the apartment where Toro lived. (PSR ¶ 28). Toro, his brother, and his mother were inside the apartment. (*Id.*). The apartment contained a trove of dangerous materials—all of the ingredients for manufacturing a bomb. (PSR ¶¶ 28-29). In Toro and his brother's shared bedroom were: (i) a glass jar containing low energy explosive powder; (ii) approximately five pounds of aluminum powder; (iii) approximately five pounds of potassium nitrate; (iv) approximately twenty pounds of iron oxide; (v) a strip of magnesium metal; (v) approximately two pounds of confectioner's sugar; (vi) a plastic container appearing to contain "thermite," mixed from iron

3

oxide and aluminum powder; (vii) a cardboard box containing firecrackers; and (viii) apparent "ball bearings," or metal spheres, and CO2 cartridges, which can be used as fragmentation for a bomb in order to inflict greater damage during an explosion. (PSR ¶ 28). Those materials are the components of an improvised explosive device ("IED"), including an explosive main charge (the low energy explosive powder), a fuzing system (the magnesium strip), a container (the glass jar), and fragmentation (the ball bearings and CO2 cartridges). (PSR ¶ 29). As noted, iron oxide and aluminum powder form thermite when combined—an explosive material that creates very high temperatures upon combustion, and is therefore used in incendiary bombs. (*Id.*).

On the apartment's fire escape, agents also found a jar of improvised napalm, consisting of gasoline and Styrofoam – a highly flammable substance also used in incendiary bombs. (*Id.*).

In addition to this cache of IED components, Toro's apartment contained several notebooks full of handwritten pages concerning the device and apparent plans relating to it, conspiracy theories, violence, and weapons. (PSR ¶ 31). For example, a diary that appeared, based on the inscription it bore, to belong to Tyler Toro, stated the following, among other things:

- "WHEN YOU FIND OUT I THREW AWAY ALL EVIDENCE [OF OPERATION CODE NAME 'FLASH'[1]] I COULD FIND IN YOUR ROOM, I HOPE THIS DOESN'T TURN INTO A SCENE FROM GOODFELLAS";
- "WE ARE TWIN TOROS STRIKE US NOW, WE WILL RETURN WITH NANO THERMITE"; and

---

[1] As noted, Toro referred to the powder he had students remove from fireworks as "flash powder." (PSR ¶ 27).

4

- "IF YOU'RE REGISTERED AS A SEX OFFENDER, THINGS WILL BE DIFFICULT.  BUT I AM HERE 100%, LIVING, BUYING WEAPONS. WHATEVER WE NEED."

(*Id.*).  A yellow backpack belonging to Toro contained a file card with handwriting that read: "UNDER THE FULL MOOON THE SMALL ONES WILL KNOW TERROR," and appeared to contain a code.[2]  (PSR ¶ 32).

Toro and his brother exchanged text messages about obtaining guns and obtaining a membership to "guns for hire" in order to "add[] credibility," so that the brothers could "travel with weapons (in trunk unloaded)" to the range.  (PSR ¶ 34).  In addition, Tyler Toro sent a text message to Toro stating, "Got us mini crossbows.  20 dollars each.  *Practice* with that.  Headshot close range would be kill shot."  (*Id.* (emphasis added)).  In one conversation, the brothers discussed the October 2017 Las Vegas nightclub shooter's police scanner.  (*Id.*).  Tyler Toro stated, "Video has some info on police scanners / We need to invest in one."  (*Id.*).  Toro responded, "Copy, I see couple on Amazon for 100."  (*Id.*).

Toro and his brother were arrested the same day that apartment was searched.  (PSR ¶ 35).  When law enforcement agents arrived at the residence, Toro was flushing marijuana (also a frequent subject of his text messages) down the toilet.  (PSR ¶ 34).

## II.     The Defendant's Plea and Applicable Guidelines Range

On February 15, 2018, Toro was charged by complaint with unlawfully manufacturing and aiding and abetting the manufacture of a destructive device, in violation of Title 26, United

---

[2] The phrase appears to be associated with various conspiracy theories and postings on the Internet, including the so-called "dark web."

5

States Code, Sections 5822, 5861(f), and 5871 and Title 18, United States Code, Section 2, and distributing explosive materials to a minor, in violation of Title 18, United States Code, Section 842(d)(1). On March 15, 2018, the grand jury returned an indictment (the "Indictment"), charging Toro with conspiring to unlawfully make and possess a destructive device, in violation of Title 18, United States Code, Section 371 and Title 26, United States Code, Sections 5822, 5861(d), 5861(f), and 5871 (Count One); unlawfully manufacturing and aiding and abetting the manufacture of a destructive device, in violation of Title 26, United States Code, Sections 5822, 5861(f), and 5871 (Count Two); unlawfully possessing a destructive device, in violation of Title 26, United States Code, Sections 5861(d) and 5871 (Count Three); and distributing explosive materials to a minor, in violation of Title 18, United States Code, Sections 842(d)(1) and 844(a)(1) (Count Four).

On November 26, 2018, Toro pleaded guilty to Counts One through Three of the Indictment, pursuant to a plea agreement (the "Plea Agreement") with the Government. The Plea Agreement calculated Toro's Criminal History Category as I, and the applicable base Guidelines offense level, pursuant to U.S.S.G. § 2K2.1(a)(4)(B), as 20. In addition, because the offense involved a destructive device, the Plea Agreement provided for a two-level increase in the offense level, pursuant to U.S.S.G. § 2K2.1(b)(3)(B). And because the defendant used a person less than eighteen years of age to commit the offense, the Plea Agreement provided for an additional two-level increase, pursuant to U.S.S.G. § 3B1.4.

The Plea Agreement also assumed a two-level reduction due to the defendant's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), and an additional one-level reduction, due to the defendant's assistance to authorities in the investigation or prosecution of

his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, pursuant to U.S.S.G. § 3E1.1(b). That calculation resulted in a stipulated Guidelines range of 37 to 46 months' imprisonment.

In the PSR, finalized on February 15, 2019, the Probation Department also concluded that the defendant's applicable Guidelines range was 37 to 46 months' imprisonment (the "Guidelines Range"), based on an applicable Guidelines offense level of 21 and a Criminal History Category of I. (PSR ¶¶ 49, 52, 82, p. 21). The Probation Department recommends that the Court sentence the defendant to 42 months' imprisonment, noting that the defendant "jeopardized th[e] safety of at least two minors"; placed the residents of his apartment building at risk; and was "at least in part responsible for the bomb threat called in to the Harlem charter school," which "undoubtedly interrupted the school, drew the resources of law enforcement and emergency services away from real emergencies, and may have caused fear" among students, teachers, and parents. (PSR at p. 22).

### III. Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense,

7

the need to adequately deter criminal conduct and promote respect for the law, and the need to provide just punishment. *Id.* at 50 & n.6. When imposing a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (quoting *Gall*, 552 U.S. at 50).

**IV.    Discussion**

    **A. The Nature and Circumstances of this Offense**

Under any circumstances, the defendant's conduct was reprehensible. Toro struck fear into the hearts of his neighbors and his community by assembling an IED, capable of inflicting great damage, injuries, and even death should it have been detonated. His conduct was no lark or exploratory educational endeavor—among other things, the scores of ball bearings he possessed, the only reasonable purpose of which would be to inflict maximum damage as fragmentation for a bomb—speak to a far more nefarious purpose. And the defendants' own words—revealing as they do a fascination with violence, conspiracy theories, weapons, and retaliation—support that interpretation of his actions.

Even if, as the defendant maintains despite his writings and text messages suggesting otherwise, his deeply disturbing actions were simply the result of his lifetime fascination with "military and law enforcement" matters, and he had no intention of detonating the device he was building and storing, *see* Defense Sentencing Memorandum, dated May 6, 2019 ("Def. Mem.") at pp. 1, 4, simply possessing and manipulating the materials posed a grave threat to the defendants' neighbors, the minors Toro enlisted to assist him, the defendants' mother, and the defendants themselves. Such conduct alone warrants a substantial sentence.

8

But there was more to the defendant's crime. He used students—individuals whose care had been entrusted to him—to assist him in his crime. He demonstrated a flash powder explosion to one of them and encouraged her to read a bomb-making manual. He paid the students handsomely—fifty dollars per hour—for their services. Although the Guidelines range includes a two-level enhancement for the use of a minor to commit the crime, it does not account for a *teacher*, who is in a unique position to influence and control his students, paying *multiple* students to build a bomb. The defendant's enlisting students in his dangerous operation renders his conduct yet more deplorable, and more harmful. What is more, the defendant was having a sexual relationship with one of those students, Student-1, who was sixteen years old at the time. The defendant argues that the Court should not consider that conduct, which is the subject of a state prosecution and is "not one of the offenses at issue." Def. Mem. at p. 4 n.1. But that argument is meritless. The nature of the relationship between the defendant and those he used to assist him in committing crimes is wholly relevant to the charged conduct here. The defendant's highly problematic behavior bears directly on the nature and circumstances of the offense, as well as his history and characteristics. And the defendant's relationship with Student-1 is yet another aggravating factor, not reflected in the Guidelines, that this Court should consider under its 18 U.S.C. § 3553(a) analysis. The defendant's sentencing memorandum describes this case as a "tragedy." Def. Mem. at p.1. It is a tragedy—not just for the defendant and his family, but for the students whose lives he affected through his deeply disturbing, and dangerous, conduct.

Also unaccounted for by the Guidelines is the bomb threat that the defendant urged Student-1 to call in to the school where he worked. This bomb threat at a New York City school undoubtedly caused panic and chaos; it also caused significant resources to be expended

9

unnecessarily. That conduct—which is closely related to, and of a piece with, the manufacture of an IED and the chilling writings found throughout the defendants' apartment—sheds some light on the defendant's intentions in building a bomb. At the very least, it suggests that the defendant intended to elicit fear with his actions, and was not simply engaged in solitary exploration in order to satisfy his own "misplaced curiosity." Def. Mem. at p. 4.

Finally, this Court should also consider the jar of improvised napalm—a substance used for incendiary bombs—found on the defendants' fire escape, both with regard to the defendant's overall intentions and as an additional aggravating factor more generally, whatever those intentions. That substance, too, could have caused grave injuries. Like the ball bearings, its sole plausible purpose is to enhance the damage that a bomb inflicts. The defendants stored it in open air outside a large New York City apartment building. The Guidelines range nowhere accounts for this additional destructive conduct.

In sum, due to the nature and circumstances of this offense, the Court should vary upward from the applicable Guidelines range. That range is the product of a statutory scheme that appears primarily designed to deter people from failing to register devices and to ensure compliance with certain restrictions governing their manufacture. It does not fully capture the conduct associated with stockpiling explosive and other materials in one's home, possibly in contemplation of using them; enlisting the help of students to build an IED; storing napalm on a fire escape; and encouraging a student to call a bomb threat into a high school.

### B. Toro's History and Characteristics

Although the defendant has no prior criminal history, he has been charged with statutory rape and related charges, based on the conduct with Student-1 described above. The defendant's

10

sentencing memorandum speaks at length about his professional success up until the charged offense, and his strong family support system. *See, e.g.*, Def. Mem. at pp. 1, 3, 6-7. However admirable the defendant's accomplishments may otherwise have been, the fact remains that he engaged in the instant offense and related conduct despite those accomplishments and while surrounded by that same support system.

The defendant asserts that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Def. Mem. Ex. B. at p.1, leading to his conduct in this case.[3] Certainly, the defendant's writings and text messages suggest a fascination with conspiracy theories. But it is important to differentiate between emotional distress and unusual fantasies on the one hand and real-world, concrete action on the other. The defendant's actions were real, and they were dangerous. They warrant a substantial term of incarceration.

### C. The Need to Promote Respect for the Law, to Ensure Just Punishment, and for Deterrence in This Case

There is a critical need in this case to promote respect for the law and to provide both general and specific deterrence. First, it is important to demonstrate to would-be offenders through this widely publicized incident the severe consequences that accompany such conduct, which threatens the public safety, inspires panic and chaos, and could, whether by design or by accident, inflict severe damage and destruction. Even taking steps in the direction of building and detonating bombs, and stockpiling caches of dangerous materials—what amounts to early-

---

[3] For this and other reasons, the Government agrees that the Court's sentence of supervised release should include a mental health treatment component, which the defendant himself has also sought. Def. Mem. at pp. 7-9.

stage planning for an attack—is incredibly serious. It should be treated accordingly at sentencing.

Second, as a prime example of law enforcement disrupting a threat early on—before any attack has happened but after a risk has emerged—this case has implications for public safety. A significant sentence would enable law enforcement to continue intercepting threats at nascent stages without compromising its ability to hold accountable those whose incipient plans have already endangered their communities.

### V.      Conclusion

We do not know precisely what plan the defendants had formulated for using the destructive device they were building. That is because law enforcement was able to apprehend them well before they could execute any such plan. But that fortunate fact should not exempt them from a term of incarceration commensurate with their chilling—and dangerous—conduct. For the foregoing reasons, the Government respectfully submits that an above-Guidelines sentence for defendant Christian Toro would be fair and appropriate, and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated: New York, New York
       May 10, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: *EHanft*
Elizabeth A. Hanft
Assistant United States Attorney
(212) 637-2334